**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2166

NETWORK COMPUTING SERVICES CORPORATION,

Plaintiff - Appellant,

versus

CISCO SYSTEMS, INCORPORATED,

Defendant - Appellee,

and

MARK ANTHONY MARTIN, III; CAROL JAWORSKI;
WOODY SESSUMS; JOHN DISPENETTE; SCOTT SAWYER,

Defendants,

WILLIAM P. CHARPING; JOHN DOE 1-25,

Counter-Defendants.

------------------------------------

IMPACT INTERNATIONAL FOUNDATION; PRINTER
PROJECTS CORPORATION; PC GENIUS INCORPORATED;
SOVEREIGN GROUP, INCORPORATED; SOVEREIGN GROUP
MARKETING LTD; WORLD MISSION CENTRE,

Movants.

NETWORK COMPUTING SERVICES CORPORATION,

Plaintiff - Appellee,

versus

CISCO SYSTEMS, INCORPORATED,

Defendant - Appellant,

and

MARK ANTHONY MARTIN, III; CAROL JAWORSKI; WOODY SESSUMS; JOHN DISPENETTE; SCOTT SAWYER,

Defendants,

WILLIAM P. CHARPING; JOHN DOE 1-25,

Counter-Defendants.

-------------------------------------

IMPACT INTERNATIONAL FOUNDATION; PRINTER PROJECTS CORPORATION; PC GENIUS INCORPORATED; SOVEREIGN GROUP, INCORPORATED; SOVEREIGN GROUP MARKETING LTD; WORLD MISSION CENTRE,

Movants.

Appeals from the United States District Court for the District of South Carolina, at Columbia.  Joseph F. Anderson, Jr., Chief District Judge.  (CA-01-281-3)

Argued:  September 21, 2005          Decided:  November 1, 2005

Before WIDENER, NIEMEYER, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Stephen G. Morrison, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellant/Cross-Appellee. Henry L. Parr, Jr., Wallace K. Lightsey, WYCHE, BURGESS, FREEMAN & PARHAM, P.A., Greenville, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Robert H. Brunson, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Charleston, South Carolina, for Appellant/Cross-Appellee. William M. Wilson, WYCHE, BURGESS, FREEMAN & PARHAM, P.A., Greenville, South Carolina, for Appellee/Cross-Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Network Computing Services Corp. (NCS) appeals the district court's grant of summary judgment in favor of the defendants, Cisco Systems, Inc. (Cisco) and others, on NCS's claims for violation of the South Carolina unfair trade practices statute and for common law fraud. NCS also appeals the district court's order sanctioning NCS for discovery violations, and Cisco cross-appeals on this issue. We affirm the district court's grant of summary judgment and decline to reach the sanctions issue.

I.

A.

Cisco makes networking equipment, which it sells to customers either directly or through distributors, called resellers. NCS distributes networking equipment and provides consulting services for installation and maintenance of that equipment. Prior to 1998 NCS primarily sold products made by 3Com Corp., a Cisco competitor. In May 1998 NCS and Cisco executed a written, one-year contract under which NCS agreed to become one of Cisco's many South Carolina resellers. NCS agreed to purchase computer products from Cisco at a discount rate tied to the volume of Cisco products that the parties projected NCS would sell. Under the contract NCS's projected sales volume for the contract year was

$5 million.  Either party could terminate the contract on 30 days written notice.

NCS alleges that, despite Cisco's contractual obligation to NCS, Cisco took advantage of sales leads that NCS supplied and then told several potential customers to do business with other, favored Cisco distributors instead of NCS.  NCS suffered when these customers went elsewhere.  In addition, NCS contends that Cisco repeatedly broke its oral "promise[] to make [NCS] the 'go to' reseller" in the state.  Appellant's Br. at 35.  For example, during 1998 the State of South Carolina solicited bids from manufacturers, or their authorized distributors, for the sale of computer network equipment to state agencies.  Cisco authorized NCS to be one of its distributors so that NCS could be listed on this contract.  In violation of an alleged oral promise to make NCS the only officially listed distributor, Cisco authorized several other companies to serve as distributors.  As a condition of listing NCS with the State, Cisco also required NCS to agree not to be listed as an official distributor of any of Cisco's competitors.

Cisco denies that these conditions were unfair in any way.  More generally, Cisco denies responsibility for NCS's loss of customers and contends that NCS's problems were of NCS's own making.  Cisco also points out that NCS never stopped selling 3Com products after commencing the Cisco distributorship and that Cisco never required NCS to do so under the contract.

NCS served as a Cisco reseller for 18 months until Cisco terminated the contract. In that time NCS ordered and received approximately $225,000 worth of Cisco products. NCS paid Cisco approximately $26,000, but did not pay the balance.

## B.

NCS sued Cisco in the U.S. District Court for the District of South Carolina, complaining that Cisco lured NCS into the distributorship through deliberate misrepresentation of the profits to be earned and that Cisco undermined NCS's ability to perform its contractual duties. The case was referred to a magistrate judge, and Cisco moved for summary judgment. NCS voluntarily dropped its federal claim under the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, as well as its state law claims for civil conspiracy, tortious interference with contract, and trade secrets misappropriation. The magistrate judge concluded that there were triable issues on whether Cisco's conduct breached an implied contractual duty of good faith and fair dealing, but rejected NCS's theory that there was an oral contract between the parties going beyond their written agreement. Further, the magistrate judge found triable issues regarding NCS's claims for common law fraud, fraud in the inducement, and violation of the South Carolina Unfair Trade Practices Act (SCUTPA), S.C. Code § 39-5-20.

Cisco objected to these recommendations of the magistrate judge, leading the district court to determine the pertinent issues de novo. The district court held that the written breach of contract claim raised a triable issue "as to whether Cisco deliberately discouraged companies from doing business with NCS (or gave information that NCS provided to other resellers to steer business away from NCS)." J.A. 718. However, after concluding that there were no triable issues on NCS's theories of breach of oral contract, SCUTPA, or fraud, the district court granted summary judgment to Cisco (and the other defendants) on these claims. The parties thereafter agreed to a partial settlement in which NCS dismissed with prejudice all of its claims except for (1) violation of SCUTPA and (2) common law fraud and fraud in the inducement. NCS now appeals the district court's rulings on these surviving claims.

As the case proceeded, a bitter discovery dispute arose. The magistrate judge ordered NCS and its chief executive, William Charping, to produce a customer list or submit an affidavit attesting that NCS could not compile such a list. By affidavit Charping denied the existence of certain documents and asserted that NCS previously produced its customer list as part of a production in September 2001. The magistrate judge then ordered NCS to produce the materials at issue or specify where they were located in documents already produced. NCS finally produced

7

several documents, including a customer list, that Cisco asserted had never previously been produced and whose existence Charping and NCS had previously denied. Alleging that NCS's response to numerous discovery orders was unsatisfactory, Cisco moved to dismiss as a sanction for the discovery violations. This motion was first considered by the magistrate judge, who recommended that a monetary sanction be imposed against NCS. The district court decided that a monetary sanction would be an insufficient deterrent against NCS's misconduct under the circumstances. Accordingly, in an opinion published at 223 F.R.D. 392 (D.S.C. 2004), the district court determined that the jury would be instructed about NCS's misconduct if the case went to trial. The specific instruction that would be used was included in the opinion. NCS appeals the sanction, and Cisco contends in a cross-appeal that the district court should have considered whether the proper sanction was dismissal.

## II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review a district court's grant of summary judgment de novo. <u>Sunrise</u>

8

<u>Corp. of Myrtle Beach v. City of Myrtle Beach</u>, 420 F.3d 322, 327 (4th Cir. 2005). Although all justifiable inferences are drawn in favor of the party opposing summary judgment, "[c]onclusory or speculative allegations do not suffice" to create a genuine issue of material fact. <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002) (punctuation omitted).

A.

To prevail on a SCUTPA claim, the plaintiff must show by a preponderance of the evidence "(1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest." <u>Havird Oil Co. v. Marathon Oil Co.</u>, 149 F.3d 283, 291 (4th Cir. 1998). The third element may be satisfied by proof of "facts demonstrating the potential for repetition of the defendant's actions." <u>Daisy Outdoor Advertising Co. v. Abbott</u>, 322 S.C. 489, 493, 473 S.E.2d 47, 49 (1996). "Plaintiffs . . . generally have shown potential for repetition in two ways: (1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence . . . or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." <u>Id.</u> at 496, 473

9

S.E.2d at 51 (citations omitted).  In focusing on the defendant's past actions, South Carolina courts have looked at the harm to the people of South Carolina caused by the challenged practice.  "The legislature intended in enacting the UTPA to control and eliminate the large scale use of unfair and deceptive trade practices within the state of South Carolina."  Noack Enters., Inc., v. Country Corner Interiors, 290 S.C. 475, 477, 351 S.E.2d 347, 349 (S.C. Ct. App. 1986) (punctuation omitted).  Public harm "must be proved by specific facts."  Jefferies v. Phillips, 316 S.C. 523, 527, 451 S.E.2d 21, 23 (S.C. Ct. App. 1994).

With respect to the third SCUTPA element, NCS failed to adduce evidence sufficient to create a genuine issue of material fact regarding whether Cisco's conduct caused harm to any member of the South Carolina public.  NCS offered three documents from executives at companies who alleged that Cisco mistreated them in various business transactions, but none of these documents can bear the weight NCS places on them.  One document is from the president of a Florida corporation; another document is from the president of an Arizona corporation.  Neither document describes acts by Cisco either in South Carolina or affecting South Carolina residents. The third document is a letter from a lawyer for NCS recounting a conversation he had with the president of a company in Gainesville, Florida, that dealt with Cisco.  According to the letter, Cisco attempted to restrict the parameters of any bid this company might

10

make on a potential contract with the College of Charleston in South Carolina. This letter does not satisfy the statutory requirement that the witness certify that an unsworn statement is true by stating that it is "under penalty of perjury" or using other language "substantially . . . [similar in] form." 28 U.S.C. § 1746. In response to the lawyer's request that the company president "confirm by signing below that these statements convey an accurate representation of some of the things that you advised us," J.A. 337, the president affixed his notarized signature under the words "I CONFIRM." The notary's certificate simply means that the president's signature is authentic. It is not a substitute for language indicating that the witness understood he risked prosecution for perjury if he gave false testimony. Cisco adequately objected to the letter's admissibility in its challenge to the magistrate court's report. Thus, NCS cannot survive summary judgment based on any of the three documents it presented.

Nor did NCS present "specific facts" indicating that Cisco's business procedures risked repeating "unfair and deceptive acts." There was no evidence, for example, that Cisco trained its agents to make misleading representations to potential resellers or that Cisco used a standard distribution contract that contained falsehoods. NCS did not show that there was any real danger that Cisco routinely deceived, or could have deceived, its business partners. South Carolina courts have relied on such danger when

11

they have found that a "company's procedures create a potential for repetition of the unfair and deceptive acts."  See Daisy Outdoor Advertising, 322 S.C. at 493-95, 473 S.E.2d at 49-51 (describing prior cases).

Because NCS could not meet its burden on the public interest element of its SCUTPA claim, summary judgment in Cisco's favor was proper.

B.

For claims of "fraud and deceit, based upon representation," such as those NCS asserts against Cisco,

> [t]he following elements must be shown by clear, cogent and convincing evidence:  (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; (9) the hearer's consequent and proximate injury. Failure to prove any one of the foregoing elements is fatal to recovery.

O'Shields v. S. Fountain Mobile Homes, Inc., 262 S.C. 276, 281, 204 S.E.2d 50, 52 (1974).  "[F]raud may be based . . . on promises made without an intention of performance."  Thomas & Howard Co. v. Fowler, 225 S.C. 354, 358, 82 S.E.2d 454, 456 (1954).  Breach of a contractual promise alone is not enough to prove such fraud, however.  "Nonobservance of a promise may support an inference of a lack of intent to perform only when it is coupled with other

12

evidence." Winburn v. Ins. Co. of N. Am., 287 S.C. 435, 441, 339 S.E.2d 142, 146 (S.C. Ct. App. 1985).

NCS argues that it proffered sufficient evidence from which a reasonable jury could conclude that Cisco never intended to help NCS sell the $5 million in Cisco products that the distributorship contract indicated NCS would sell. But NCS does not offer "other evidence" that goes beyond Cisco's "[n]onobservance of a promise." Id. The district court did not allow NCS to rest on the suggestion that, because Cisco did not do all that it could have done to help NCS sell products after the contract was executed, Cisco must have lacked intent to perform the promise at the time the contract was executed. In so holding, the district court correctly applied South Carolina law. See Winburn, 287 S.C. at 440, 339 S.E.2d at 146 ("The truth or falsity of a representation must be determined as of the time it was made or acted on and not at some later date. Inferences of fact, like fullbacks on football teams, do not ordinarily run backward.") (citations omitted). Even if the inference was permitted, it would fall short of the "clear, cogent and convincing" evidence of fraud that South Carolina law demands. In sum, NCS could not meet its burden on the fraud claims, and summary judgment in favor of Cisco was proper.

13

III.

We turn briefly to the sanctions issue. Because we conclude that summary judgment was correctly granted to Cisco on the only claims that NCS did not agree to settle, this case will not proceed to a jury trial. Thus, there is no possibility that a jury will receive the instruction that the district court crafted as a sanction for NCS's discovery violations. As a result, we need not reach the question whether the district court abused its discretion in choosing this sanction.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

14